1

2

3

4

5                          IN THE UNITED STATES DISTRICT COURT

6                          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8    STERLING SAVINGS BANK,                    No. C -12-01454 EDL

9              Plaintiff,                      **ORDER GRANTING PLAINTIFF'S
                                               MOTIONS FOR SUMMARY
10       v.                                    JUDGMENT; DENYING DEFENDANT'S
                                               MOTION FOR SUMMARY JUDGMENT;
11                                             GRANTING IN PART PLAINTIFF'S
     NORMAN POULSEN,                           MOTION TO STRIKE THE
12                                             DECLARATION OF ROGER
               Defendant.                      BERNHARDT; AND GRANTING
13                                             PLAINTIFF'S MOTION TO STRIKE
                                               THE DECLARATION OF WILLIAM
14   _____/         SARSFIELD**

15

16        Before the Court are Plaintiff's Motion for Summary Judgment, Plaintiff's Motion for

17   Summary Judgment as to Defendant's Counterclaims for violation of California Welfare and

18   Institutions Code section 15610.30 and for rescission, Defendant's Motion for Summary Judgment,

19   Plaintiff's Motion to Strike the Declaration of Roger Bernhardt and Plaintiff's Motion to Strike the

20   Declaration of William Sarsfield.   For the reasons stated at the July 19, 2013 hearing and in this

21   Order, Plaintiff's Motions for Summary Judgment are granted, Defendant's Motion for Summary

22   Judgment is denied, and Plaintiff's Motions to Strike are granted in part.

23   **Facts**

24        Defendant is a real estate investor with at least forty years of experience buying, selling

25   and holding real estate directly and through her company, Sutter Investment Corporation ("Sutter").

     Appx Ex. 20 at 32.  Sutter was created approximately fifty years ago by Defendant's father, and as

26   Defendant's father aged, Defendant took over control of the company.  Appx. Ex. 20 at 26-27.  After

27   Defendant's father died in 1989, Defendant and her children inherited the shares of Sutter:

28   Defendant inherited one-third of the shares, David Poulson, Defendant's son, inherited one-third,

     and Defendant's two daughters inherited one-third.   Appx Ex. 26 at 35.  Defendant and her children

**United States District Court**
**For the Northern District of California**

United States District Court
For the Northern District of California

1  became officers of Sutter, Defendant served as President and Chief Executive Officer, David

2  Poulson served as Vice President, and Kareen Poulson, one of Defendant's daughters, was Sutter's

3  Secretary and bookkeeper.  Appx Ex. 20 at 40-41; Ex. 26 at 30.  David Poulson testified that

4  Defendant was always the final decision-maker for Sutter.  Appx Ex. 24 at 32, 39, 58.

5          In 2007, Defendant's daughters sold their shares to Defendant and David.  Appx Ex. 20 at

6  39-40.  Although Defendant filed a declaration in support of this motion stating that she was only

7  the "nominal president" of Sutter, as a result of the daughters' sales of stock, Defendant and David

8  became equal 50% owners of Sutter.  Appx Ex. 20 at 39-40.  In 2011, Defendant ousted David from

9  his position as Vice President and locked David out of Sutter's offices.  Appx Ex. 22 at 529, 534-35;

10  Ex. 36 at 65-66.

11          Between 1999 and 2007, Sutter obtained the four loans at issue in this case from Plaintiff:

12      **1.          The Elmira loan**

13          On February 9, 2007, Plaintiff made a $1,300,000 loan to Sutter.  Appx. Ex. 2 (promissory

14  note), 3 (deed of trust).  The deed of trust encumbered real property located at 141 Elmira Road in

15  Vacaville.  Id.

16          On February 16, 2007, Plaintiff executed a Commercial Guaranty, unconditionally

17  guaranteeing to repay any unpaid balance due under the Elmira loan.  Appx. Ex. 4 at 1 ("For good

18  and valuable consideration, Guarantor, absolutely and unconditionally guarantees full and punctual

19  payment and satisfaction of Guarantor's Share of the Indebtedness to Borrower to Lender, and the

20  performance and discharge of all Borrower's obligations under the Note and related documents.").

21  The "Guarantor's Share of the Indebtedness" was defined in the Commercial Guaranty to not exceed

22  $1,300,000 "of the principal amount, interest thereon to the extent not prohibited by law, and all

23  collection costs, expenses, and attorney's fees whether or not there is a lawsuit, and if there is a

24  lawsuit, any fees and costs for trial and appeals."  Id.  Further, the Commercial Guaranty stated:

25      GUARANTOR'S REPRESENTATIONS AND WARRANTIES. Guarantor
        represents and warrants to Lender that (A) no representations or agreements of any
26      kind have been made to Guarantor which would limit or qualify in any way the terms
        of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the
27      request of Lender; (C) Guarantor has full power, right and authority to enter into this
        Guaranty . . . (J) Guarantor has established adequate means of obtaining from
28      Borrower on a continuing basis information regarding Borrower's financial
        condition. Guarantor agrees to keep adequately informed from such means of any

2

facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

Appx Ex. 4 at 2.  Finally, above Defendant's signature line, the Commercial Guaranty stated:

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER . . .

Id. at 4.  Defendant testified that she signed this document, which was notarized.  Appx Ex. 20 at 147-48.

Sutter failed to pay on the Elmira loan, and on February 24, 2011, a Notice of Default and Election to Sell Under Deed of Trust was sent to Sutter and recorded against the Elmira property. Brixey Decl. ¶ 6; Appx. Ex. 5.  On July 1, 2011, the Elmira property was sold at a non-judicial foreclosure sale.  Brixey Decl. ¶ 7.  Plaintiff was the successful bidder at the non-judicial foreclosure sale and the amount of Plaintiff's credit bid was applied to reduce the outstanding balance of the Elmira loan, for an outstanding balance as of the foreclosure sale of $454,923.58.  Brixey Decl. ¶ 7. As of June 7, 2013, there remained $559,751.87 in principal and interest due on the Elmira loan.  Id. ¶ 8.  Interest continues to accrue at the daily rate of $148.48.  Id.

### 2. The Hearn loan

On July 21, 2004, Plaintiff made a $243,750 loan to Sutter.  Appx. Ex. 7 (promissory note), 8 (deed of trust).  The deed of trust encumbered real property located at 1115 Hearn Avenue in Santa Rosa.  Id.

On July 27, 2004, Plaintiff executed a Commercial Guaranty, unconditionally guaranteeing to repay any unpaid balance due under the Hearn loan up to $2,500,000.  Appx. Ex. 9 at 1 ("For good and valuable consideration, Norma L. Poulson absolutely and unconditionally guarantees and promises to pay to Sonoma National Bank, its successors and/or assigns, or its order, in legal tender of the United States of America, the indebtedness of Sutter Investment Corporation, a California Corporation to Lender on the terms and conditions as set forth in this Guaranty.  The obligations of Guarantor under this Guaranty are continuing.").  "Indebtedness" was defined as "any and all of Borrower's indebtedness to Lender and is used in the most comprehensive sense and means and

includes any and all of Borrower's liabilities, obligations and debts to Lender, now existing or

hereinafter incurred or created, including, without limitation, all loans advances, interest, costs

debts, overdraft indebtedness, credit card indebtedness, lease obligations, or other obligations, and

liabilities of Borrower . . . ." Id.  Further, the Commercial Guaranty stated:

> GUARANTOR'S REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty . . . (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

Appx Ex. 9  at 2.  Finally, above Defendant's signature line, the Commercial Guaranty stated:

> EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER . . .

Id. at 4.  Defendant testified that she signed this document, which was notarized.  Appx Ex. 20 at

108-09.

Sutter failed to pay on the Hearn loan, and on November 16, 2011, a Notice of Default and

Election to Sell Under Deed of Trust was sent to Sutter and recorded against the Hearn property.

Brixey Decl. ¶¶ 13-14; Appx. Ex. 10.  On March 15, 2012, the Hearn property was sold at a non-

judicial foreclosure sale.  Brixey Decl. ¶ 14.  Plaintiff was the successful bidder at the non-judicial

foreclosure sale and the amount of Plaintiff's credit bid was applied to reduce the outstanding

balance of the Hearn loan, for an outstanding balance as of the foreclosure sale of $108,064.74.

Brixey Decl. ¶ 14.  As of June 7, 2013, there remained $122,500.39 in principal and interest due on

the Hearn loan.  Id. ¶ 15.  Interest continues to accrue at the daily rate of $31.52.  Id.

### 3.        The Moorland loan

On January 27, 2005, Plaintiff made a $116,000 loan to Sutter.  Appx. Ex. 12 (promissory

note), 13 (deed of trust).  The deed of trust encumbered real property located at 3128 Moorland

Avenue in Santa Rosa.  Id.

On January 28, 2005, Plaintiff executed a Commercial Guaranty, unconditionally guaranteeing to repay any unpaid balance due under the Moorland loan.  Appx. Ex. 14 at 1 ("For good and valuable consideration, Norman L. Poulson absolutely and unconditionally guarantees and promises to pay to Sonoma National Bank, its successors and/or assigns, or its order, in legal tender of the United States of America, the indebtedness of Sutter Investment Corporation, a California Corporation to Lender on the terms and conditions as set forth in this Guaranty.  The obligations of Guarantor under this Guaranty are continuing.").  "Indebtedness" was defined as "(a) all principal, (b) all interest, (c) all late charges, (d) all loan fees and loan charges, and (e) all collection costs and expenses relating to the Note or to any collateral for the Note. Collection costs and expenses include without limitation, all of Lender's attorneys' fees."  Id.  Further, the Commercial Guaranty stated:

> GUARANTOR'S REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty . . . (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

Appx Ex. 14  at 1-2. Finally, above Defendant's signature line, the Commercial Guaranty stated:

> EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER . . .

Id. at 4.  Defendant testified that she signed this document, which was notarized.  Appx Ex. 20 at 129-31.

Sutter failed to pay on the Moorland loan, and on January 9, 2012, a Notice of Default and Election to Sell Under Deed of Trust was sent to Sutter and recorded against the Hearn property.  Brixey Decl. ¶ 20; Appx. Ex. 15.  On May 24, 2012, a third party acquired title to the Moorland property at the non-judicial foreclosure sale with a bid in the amount of $118,370.41, which was credited to the amounts owed under the Moorland loan, leaving an outstanding balance as of the foreclosure sale of $650.48.  Brixey Decl. ¶ 21.  As of June 7, 2013, there remained $723.90 owing

5

on the Moorland loan.  Id. ¶ 22.  Interest continues to accrue at the daily rate of $0.19.  Id.

### 4.    The Normandie loan

On March 26, 1999, Plaintiff made a $250,000 loan to Sutter.  Appx. Ex. 17 (promissory note), 18 (deed of trust).  The deed of trust encumbered real property located at 1749 Normandie Road in Santa Rosa.  Id.

On April 5, 1999, Plaintiff executed a Commercial Guaranty, unconditionally guaranteeing to repay any unpaid balance due under the Normandie loan.  Appx. Ex. 19 at 1 ("For good and valuable consideration, Norma L. Poulson absolutely and unconditionally guarantees and promises to pay to Sonoma National Bank, or its order, in legal tender of the United States of America, the indebtedness of Sutter Investment Corporation, a California Corporation to Lender on the terms and conditions as set forth in this Guaranty.  The obligations of Guarantor under this Guaranty are continuing.").  "Indebtedness" was defined as "any and all of Borrower's liabilities, debts, and indebtedness to Lender, now existing or hereinafter incurred or created, including without limitation, all loans, advances, interest, costs, debts . . . and liabilities of Borrower . . . as guarantor or surety."  Id.  Further, the Commercial Guaranty stated:

> GUARANTOR'S REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender that (a) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (b) this Guaranty is executed at Borrower's request and not at the request of Lender; (c) Guarantor has full power, right and authority to enter into this Guaranty . . . (j) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

Appx Ex. 19  at 1-2.  Finally, above Defendant's signature line, the Commercial Guaranty stated:

> EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECT UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER . . .

Id. at 4.  Defendant testified that she signed this document, which was notarized.  Appx Ex. 20 at 92-94.

Sutter failed to pay on the Normandie loan.  Brixey Decl. ¶ 27.  Sutter had also defaulted on

a loan owed to a junior lienholder who had previously foreclosed on the Normandie property as a result of Sutter's default.  Id.  In or around September 2012, the junior lienholder paid $216,000 to have the Normandie Deed of Trust removed from the title.  Id.  The $216,000 was applied to reduce the Normandie loan, leaving an outstanding balance of $8,872.57.  Id.  As of June 7, 2013, there remained $9,614.89 owing on the Moorland loan.  Id. ¶ 28.  Interest continues to accrue at the daily rate of $2.92.  Id.

### 5.    Additional facts

Earlier in this litigation, Defendant contended that she suffered from dementia or early Alzheimer's disease that precluded her from understanding the guaranties that she executed.  During discovery, however, Defendant testified that she was not incompetent when she executed the guaranties.  Appx Ex. 22 at 604-05.  Defendant's doctor, Tedde Rinker, testified that in 1999, Defendant did not have dementia or Alzheimer's disease.  Appx Ex. 23 at 35.  Rinker testified that she has never diagnosed Defendant with dementia or Alzheimer's disease.  Id. at 70.

Further, the Title and Escrow Officer for North Bay Title Company, Kathleen Engler, who was present on several occasions when Defendant signed loan documents, including the Moorland guaranty, testified that Defendant appeared competent when she signed documents, and had Defendant appeared incompetent or impaired, Engler would not have let Defendant execute the loan documents.  Appx Ex. 27 at 92-93.  She testified that she did not prevent Defendant from reading the documents that Defendant signed.  Id.  Engler testified that prior to Defendant signing documents, Engler would physically hand the document to Defendant, read aloud the title of the document and show Defendant where to sign.  Appx Ex. 27 at 41.  In closing its loans, Plaintiff's practice was to rely on title or escrow companies to handle the execution of loan documents and verify the identity of signatories.  Appx 28 at 25, 63-64.

Defendant testified that she never met with anyone from the bank, including Clem Carinalli, a former officer with Plaintiff.  Appx Ex. 22 at 612.  When asked at deposition to provide facts regarding any alleged improper conduct by David Poulson, Defendant's son, relating to the loans or guaranties, Defendant could not recall any threats or coercion.  Appx Ex. 20 at 85, 155.  Engler testified that she did not see David Poulson engage in any improper conduct against Defendant or do

1    anything to prevent Defendant from reading the loan documents that were presented to her.  Appx

2    Ex. 26 at 93.  David Poulson testified that he did not coerce Defendant into signing any guaranties or

3    any other loan document.  Appx Ex. 24 at 94.

4           Further, Defendant never notified Plaintiff of any alleged intimidation by David Poulson or

5    of any other conduct relating to an elder abuse claim.  Appx Ex. 22 at 477, 494, 500, 509-10, 512-

6    14.  In addition, nothing prevented Defendant from going to the bank and talking to a representative

7    from Plaintiff about the loans.  Appx Ex. 22 at 555, 574.  When Plaintiff contacted Defendant on

8    several occasions after the loans went into default, Defendant refused to discuss the loans with

9    Plaintiff, instead telling Plaintiff to discuss the loans with David Poulson.   Appx Ex. 29 at 62-65;

10   Def.'s Ex. 7 at 62-65; Ex. 8 at 13-14, 18-19, 22-25.

11          Chris Rosell was the Sonoma National Bank loan officer who was the account manager for

12   Defendant and Sutter.  Def.'s Ex. 5 at 50-52.  Rosell had a Credit Authorization document that

13   indicated Defendant's age and that she developed real estate for many years.  Def.'s Ex. 4 at

14   SSB8318.  According to Rosell, David Poulson told Rosell that David represented Defendant, who

15   was reclusive and did not like to meet with people.  Def.'s Ex. 5 at 31-32, 44-45.  However, there is

16   evidence that Defendant appeared at the escrow company to execute all of the guaranties before a

17   notary public.  Appx Ex. 27 at 41.  Rosell testified that he had a banking relationship with the entire

18   Poulson family.  Def.'s Ex. 5 at 32.

19          Defendant argued incorrectly that in October 2012, Plaintiff stated in a letter that Defendant

20   "had no involvement in the operations or decisions made by Sutter Corp."  Poulson Decl. Ex. 2 at 2.

21   However, Defendant acknowledged at the hearing that she was mistaken.  The letter actually stated

22   something quite different: "Sterling (including Sonoma) had no involvement in the operations or

23   decisions made by Sutter Corp."  The letter also notes that Defendant "has run that company for

24   decades, and is a sophisticated real estate investor who has bought and sold real estate for many

25   years."  Id.

26          Defendant argues that Plaintiff's standard practice was to obtain guarantor's signatures in

27   advance, through a Commitment Letter.  Def.'s Ex. 24 at 100-02, 118.  Defendant notes that only

28   one of the loans Defendant took out with Plaintiff, which is not at issue in this case, had a

8

United States District Court
For the Northern District of California

1   Commitment Letter, and no letters were sent out for the Hearn and Moorland loans.  Def.'s Ex. 30 at

2   114-18, 134, 198-99.

3        David Poulson and Clam Carinalli, who was an officer at Sonoma National Bank, were

4   friends.  Def.'s Ex. 39 at 199-203.  For example, Carinalli went to David's home for a fundraiser,

5   and supported David's campaign for City Council.  Id. at 199-203, 269-70, 272-73.  As described

6   below, Defendant argues that this relationship is the mechanism through which Defendant was

7   subjected to elder abuse.  For example, Defendant notes that Carinalli attended a loan committee

8   meeting and voted to approve the Elmira loan even though the appropriate loan approval procedures

9   were allegedly not followed.  Def.'s Ex. 44.

10  **Legal Standard**

11       Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on

12  file, and any affidavits show that there is no genuine issue as to any material fact and that the

13  movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts are those

14  which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

15  (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury

16  to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most

17  favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn

18  from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The

19  court must not weigh the evidence or determine the truth of the matter, but only determine whether

20  there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

21       A party seeking summary judgment bears the initial burden of informing the court of the

22  basis for its motion, and of identifying those portions of the pleadings and discovery responses that

23  demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

24  323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively

25  demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue

26  where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

27  merely by pointing out to the district court that there is an absence of evidence to support the

28  nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party "may

9

1    not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts

2    showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  If the

3    nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to

4    judgment as a matter of law." Celotex, 477 U.S. at 323.

5    **Motions to Strike**

6         Plaintiff has moved to strike the declarations of Defendant's experts, Roger Bernhardt and

7    William Sarsfield.  Federal Rule of Evidence 702 requires that a testifying expert be "qualified as an

8    expert by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. The threshold for

9    qualification is low; a minimal foundation of knowledge, skill, and experience suffices.  Hangarter v.

10   Provident Life & Accident Ins. Co., 373 F.3d 998, 1015–16 (9th Cir. 2004); see also Thomas v.

11   Newton Int'l Enterprises, 42 F.3d 1266, 1269 (9th Cir. 1994). When faced with a proffer of expert

12   testimony, a district court must determine whether the testimony is both reliable and relevant.

13   Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).  The Court has broad discretion in

14   assessing both requirements. See United States v. Alatorre, 222 F.3d 1098, 1100 (9th Cir. 2000).

15   **1.    Plaintiff's Motion to Strike the Declaration of Roger Bernhardt is granted in part**

16        Bernhardt is a professor of law at Golden Gate University School of law.  Berhardt Decl. Ex.

17   1 at 1.  He states that he has been qualified to provide an expert opinion in matters relating to

18   banking customs and practices in California.  Id.  His expertise is in Real Estate and Mortgage Law.

19   Id.  In general, he opines that Plaintiff "should have made an inquiry into the circumstances of elder

20   Lisa Poulson's execution of certain guaranties which plaintiff seeks to enforce in this litigation to

21   ensure that she knowingly agreed to them."  Id. at 4.  He also opines that Plaintiff's "failure to make

22   any inquiry into the circumstances of elder Lisa Poulson's execution of certain guaranties which

23   plaintiff seeks to enforce in this litigation constitutes financial abuse of an elder under California

24   Welfare & Institutions Code 15600."  Id.

**A.    Bernhardt may be qualified to testify as to the customs and practices in the
California banking industry, but not as to financial elder abuse.**

27        In his expert report, Bernhardt states that: "I have been qualified as an expert in matters

     relating to banking customs and practices in California and nationally in state and federal courts in

28   California."  Bernhardt Decl. Ex. 1 at 1.  Bernhardt, however, has never worked in the California

United States District Court
For the Northern District of California

10

1   banking industry, has never worked for a government agency that regulates the banking industry,

2   and does not appear to have any other banking experience.  His resume indicates that he was in

3   private practice from 1964-1969 and then a law professor from 1969 to the present.  Id. Ex. 1 at Ex.

4   A.  Bernhardt's writings and activities in his resume focus on real property and real estate matters,

5   and do not focus on banking, except as to mortgage and deed of trust practice.  Id.  The articles

6   authored by Bernhardt that are attached to his expert report do not address the customs and practices

7   in the California banking industry, although he has written about guaranties, mortgages and deeds of

8   trust.  Id. Ex. 1 at Ex. C; cf. United States v. Bighead, 128 F.3d 1329, 1330 (9th Cir. 1997) (the court

9   qualified an expert to testify regarding common traits in child abuse victims based on the expert's

10  personal observations of 1,300 child abuse victims); Ralston v. Mortgage Investors Group, Inc.,

11  2011 WL 6002640 (N.D. Cal. Nov. 30, 2011) (allowing an experienced  mortgage broker to testify

12  about industry practices and general practices of and incentives affecting mortgage brokers, but

13  excluded his expert testimony about a specific loan product because there was no foundation

14  showing that he was qualified to testify about that specific loan).

15        Although Bernhardt may be qualified as an expert to address the California banking industry

16  in general terms, he is not qualified to opine as to financial elder abuse.  In his report, Bernhardt

17  opines that: "the plaintiff's failure to make any inquiry into the circumstances of elder Lisa

18  Poulson's execution of certain guaranties which plaintiff seeks to enforce in this litigation

19  constitutes financial abuse of an elder under California Welfare and Institutions Code § 15600."

20  Bernhardt Decl. Ex. 1 at 4.  He further states that:

21        Given the special wording of this statute [§ 15610.30], the only circumstances under
        which a taker or appropriator from an elder would be deemed to lack the requisite
22        statutory mental condition would be in the case that the appropriator had not been
        given any information as to the elder's age. . . . To know of an elder's condition (age)
23        is to know (or be said to should have known) that the elder has a right to her property,
        which means any taking can be deemed to be in bad faith, which means that the
24        appropriation can be for a wrongful use.

25  Id. at 7.  Bernhardt lacks the "knowledge, skill, expertise, training or education" relating to elder

26  abuse.  Bernhardt states that he authored an article called "Three Lessons for Lawyers" that dealt

27  with, among other things, financial elder abuse.  Bernhardt Decl. Ex. 1 at Ex. D.  That article was

28  co-authored by another person, and in the article, Bernhardt stated that he "gratefully acknowledges

**United States District Court**
For the Northern District of California

1   the contributions of his colleague [and co-author] Christine Tour-Sarkissian to this portion [financial

2   elder abuse] of this issue's Midcourse Corrections. . . ." Shin Decl. Ex. A at 5.  Thus, this article

3   does not support a finding that Bernhardt has expertise with financial elder abuse.  Bernhardt also

4   stated that he reviewed some materials on elder abuse, including training materials for banks

5   regarding elder abuse and articles about financial elder abuse.  Id. at Ex. 1 at 2.  Bernhardt's review

6   of articles and materials about financial elder abuse appears to be his only experience with the topic.

7   Further, Bernhardt's opinion is contrary to California law, as discussed in detail below.  See Das v.

8   Bank of America, 186 Cal.App.4th 727, 741 (2010); Stebley v. Litton Loan Servicing, 202

9   Cal.App.4th 522, 527-28 (2011).  Tellingly, Defendant does not respond directly to Plaintiff's

10   challenge to Bernhardt's qualifications on this subject.  Thus, Plaintiff's motion to strike the

11   Bernhardt declaration based on a lack of qualification as to financial elder abuse is well-taken.

12          **B.        Bernhardt improperly opines on ultimate legal issues**

13          Bernhardt's report contains his opinions on ultimate legal issues, such as his opinion that

14   "the plaintiff's failure to make any inquiry into the circumstances of elder Lisa Poulson's execution

15   of certain guaranties which plaintiff seeks to enforce in this litigation constitutes financial abuse of

16   an elder under California Welfare and Institutions Code § 15600."  Bernhardt Decl. Ex. 1 at 4; see

17   Gable v. National Broadcasting Co., 727 F. Supp. 2d 815, 835-36 (C.D. Cal. 2010) ("It is well

18   established that, 'an expert may not state his or her opinion as to legal standards, nor may he or she

19   state legal conclusions drawn by applying the law to the facts.'") (internal citation omitted).

20   Plaintiff's motion to strike the Bernhardt report to the extent it contains improper opinions on

21   ultimate legal issues is well-taken.

22          **C.        Conclusion**

23          The motion to strike the declaration of Roger Bernhardt is granted to the extent that

24   Bernhardt opines on financial elder abuse and states legal conclusions.

25   **2.        Plaintiff's Motion to Strike the Declaration of William Sarsfield is granted**

26          Sarsfield is a financial consultant and a Senior Adjunct Professor at Golden Gate University

27   School of Business.  Sarsfield Decl. Ex. 1 at Ex. A.  He states that he is qualified as an expert in the

28   fields of banking, financial services, securities, predictive analysis on various business transactions

and events, and preparation and analysis of causation of damages and damage modeling in state and federal courts.  Sarsfield Decl. ¶ 1.  With respect to financial elder abuse, he opined that the elder abuse law practice in the "know your customer" programs was ignored which set the stage for an improper execution of guaranties.  Sarsfield Decl. Ex. 1 at 7.

### A.    Sarsfield is not qualified to opine as to financial elder abuse

Sarsfield has extensive experience in the banking industry, but not in financial elder abuse.  See Sarsfield Decl. Ex. 1 at 8 (Witness Qualifications).  His resume does not indicate any expertise with elder abuse or the California elder abuse act, and Defendant does not point to any relevant experience.  Id. Ex. 1 at Ex. A.  It only appears that he read some articles about financial elder abuse, which is insufficient.  Further, Sarsfield's opinion as to financial elder abuse is not supported by the articles that Sarsfield read in preparation for his report.  Compare Sarsfield Decl. Ex. 1 at 6 (opining that the lack of customer contact is contrary to the requirements of the California Financial Elder Abuse statutes), with, Shin Decl. Ex. B (California Bankers Association "Stop Elder Abuse" brochure, which does not mention section 15610.30 or any requirement to contact elders).  Thus, Plaintiff's motion to strike the Sarsfield declaration based on a lack of qualification as to financial elder abuse is well-taken.

### B.    Sarsfield's opinion is conclusory

Sarsfield's report provides conclusory opinions as to the calculation on the amounts of deficiencies on the loans and on lending standards and practices.  For example, he opined that the Moorland loan "has been paid, and that Sterling Savings Bank has no loss per valuation, and even a possible gain following a quick sale."  Sarsfield Decl. Ex. 1 at 2.  With respect to the Hearn loan, Sarsfield opined that it was "an example of a loan that reflects a material variance from standard banking practice."  Id. at 3.

Plaintiff points out that Sarsfield has no experience as a loan officer or loan servicer that would provide him with any specialized knowledge on lending issues.  Even if Sarsfield is qualified to opine as to the remaining amounts of the loans in this case, his opinions are not helpful to the Court because he fails to explain how he reached his conclusions.  See Beech Aircraft Corp. v. United States, 51 F.3d 834, 842 (9th Cir. 1995) (affirming exclusion expert opinion regarding what

United States District Court
For the Northern District of California

13

1    would be heard on a taped conversation: "We are of the opinion that the trial court properly

2    excluded the testimony because it did not concern a proper subject for expert testimony. Plaintiffs

3    offered Drs. Shuy and McDermott to testify as to what could be heard in a tape recorded

4    conversation, yet hearing is within the ability and experience of the trier of fact.").  Therefore,

5    Sarsfield's opinion with respect to the loans in this case is comprised merely of a summary of emails

6    and documents regarding each loan, without explaining how he reached his conclusion.

7         **C.      Sarsfield improperly opines on ultimate legal issues**

8         Sarsfield's report also improperly opines on ultimate legal issues.  Gable v. National

9    Broadcasting Co., 727 F. Supp. 2d 815, 835-36 (C.D. Cal. 2010) ("It is well established that, 'an

10   expert may not state his or her opinion as to legal standards, nor may he or she state legal

11   conclusions drawn by applying the law to the facts.'") (internal citation omitted).  For example,

12   Sarsfield opined that: "The lack of customer contact is contrary not only to the requirements of

13   'Know Your Customer,' but also the requirements of California Financial Elder Abuse standards."

14        **D.      Conclusion**

15        The motion to strike the declaration of William Sarsfield is granted.

16   **Discussion**

17   **1.      There is no triable issue of fact that Defendant has breached the loan guaranties.**

18        A claim for breach of guaranty requires: (1) the existence of a contract; (2) plaintiff's

19   performance or excuse for non-performance under the contract; (3) defendant's breach under the

20   contract; and (4) damages.  See Acoustics, Inc. v. Trepte Constr. Co., 14 Cal.App.3d 887, 913

21   (1992); see also Bank of Sierra v. Kallis, No. CIV F 05-1574, 2006 WL 3513568, at *7 (E.D.Cal.

22   Dec. 6, 2006) (breach of a written guaranty is a contractual cause of action that requires proof of the

23   same elements as breach of contract).  A valid contract requires: (1) parties capable of contracting;

24   (2) their consent; (3) a lawful object; and (4) sufficient cause or consideration.  Cal. Civ. Code §

25   1550.  Valid consent is: (1) free; (2) mutual; and (3) communicated to the other.  Cal. Civ. Code §

26   1565; see also Cal. Civ. Code § 1580 ("Consent is not mutual, unless the parties all agree upon the

27   same thing in the same sense.").

28        **A.      Existence of a valid contract**

United States District Court
For the Northern District of California

### i.      Parties capable of contracting

Defendant testified that she was competent at the time she executed the guaranties.  Appx Ex. 22 at 604-05.  In addition, each guaranty that Defendant signed contained a warranty that she had the "full power, right and authority" to enter into the guaranty and that she "read and understands the terms of the" guaranties.  See, e.g., Appx Ex. 14 at 3; Cal. Evid. Code § 622 ("The facts recited in a written instrument are conclusively presumed to be true as between the parties thereto, or their successors in interest; but this rule does not apply to the recital of a consideration.").  Forgetfulness or old age is not a factor in determining the capacity to contract.  See Brunoni v. Brunoni, 93 Cal.App.2d 215, 218 (1949) ("It is readily apparent that the foregoing evidence does no more than show that the decedent was aged, suffered pain and was forgetful. . . . Old age does not render a person incompetent to execute a deed. Nor will sickness, extreme distress or debility of body affect the capacity of the grantor to make a conveyance if sufficient intelligence remains." ) (internal citation omitted).  Defendant does not dispute that the parties were capable of contracting.

### ii.      Consent

Plaintiff argues that Defendants consented to the guaranties because Defendant executed the guaranties, which stated the terms that govern the parties' contract on their face.  See Stewart v. Preston Pipeline Inc., 134 Cal.App.4th 1565, 1587 (2005) ("Mutual assent to contract is based upon objective and outward manifestations of the parties; a party's 'subjective intent, or subjective consent, therefore is irrelevant.'") (internal citations omitted).  A failure to read or understand the guaranties before signing them does not create a triable issue of fact.  See id. ("Plaintiff's opposition—based upon nothing more than his claim that he had not read or understood the agreement before signing it—raised no triable issue on the question of mutual assent.").  Although Defendant contends that she did not knowingly agree to the terms of the guaranties before signing them, her subjective belief is not relevant.  See Marin Storage & Trucking, Inc., 89 Cal.App.4th 1042, 1049 (2001) ("An actual negotiation regarding every term has never been required for the formation of a contract. The existence of mutual assent is determined by objective criteria, not by one party's subjective intent. The test is whether a reasonable person would, from the conduct of the parties, conclude that there was a mutual agreement.").

15

In <u>Stewart</u>, the parties resolved their disputes through settlement and signed a settlement agreement. The plaintiff, however, argued that there was no mutual consent to the agreement and therefore, summary judgment in favor of the defendant should be denied. The court found that the settlement agreement was a valid contract:

> Here, the settlement agreement itself demonstrated each element of the contract. It identified the parties, facially evidenced mutual consent, had a lawful object of resolving litigation, and contained mutual promises (sufficient consideration).

<u>Id.</u> at 1586. In <u>Stewart</u>, the plaintiff argued that he did not read the settlement agreement before signing it and that he "did not understand what the document meant or what the terms, conditions or consequences were . . . and only signed the document because his attorney told him to do so." <u>Id.</u> at 1586. The <u>Stewart</u> court held that:

> Mutual assent to contract is based upon objective and outward manifestations of the parties; a party's "subjective intent, or subjective consent, therefore is irrelevant." Defendants' motion established from the face of the agreement that there was mutual assent. It was signed by both plaintiff and his attorney, and there was no indication from the document that it was conditional or that plaintiff did not intend to be bound by its terms. Plaintiff's opposition—based upon nothing more than his claim that he had not read or understood the agreement before signing it—raised no triable issue on the question of mutual assent.

<u>Id.</u> at 1587 (internal citations omitted); <u>see also</u> <u>Marin Storage</u>, 89 Cal.App.4th at 1049 (a party "who signs an instrument which on its face is a contract is deemed to assent to all its terms").

Defendant argues that her failure to read the guaranties before signing them was excusable because she relied on misrepresentations by others. <u>See</u> <u>Rosenthal v. Great Western Financial Securities Corp.</u>, 14 Cal.4th 394, 419-23 (1996). In <u>Rosenthal</u>, the question was whether a contract was void for fraud in the execution, and the Court stated:

> In the latter case, California law, like the Restatement, requires that the plaintiff, in failing to acquaint himself or herself with the contents of a written agreement before signing it, not have acted in an objectively unreasonable manner. *One party's misrepresentations as to the nature or character of the writing do not negate the other party's apparent manifestation of assent, if the second party had "reasonable opportunity to know of the character or essential terms of the proposed contract."* If a party, with such reasonable opportunity, fails to learn the nature of the document he or she signs, such "negligence" precludes a finding the contract is void for fraud in the execution.

<u>Rosenthal</u>, 14 Cal.4th at 423 (emphasis added). Here, even if David Poulson or someone else made

1   misrepresentations to Defendant, as she argues, there is no dispute that she had a "reasonable

2   opportunity to know of the character or essential terms of the proposed contract" even if she now

3   states in her declaration that she did not know about the guaranties until she was sued, because she

4   was presented with each document at the signing, yet she did not read the documents.

5          Defendant further cites <u>Brown v. Wells Fargo Bank</u>, 168 Cal.App.4th 938, 952 (2008) for the

6   argument that a bank must "do more" to assist customers in reviewing and understanding documents

7   they sign.  <u>Brown</u>, however, is distinguishable.  There, the court determined that under the "unusual

8   particular facts" of the case, the bank was required to do more to assist elderly clients to understand

9   the documents they were signing.  In that case, the plaintiff was ninety-three years old, in failing

10  health and legally blind when he signed an agreement with the bank that allowed the bank to make

11  stock trades with the plaintiff's stock.  <u>Id.</u> at 946.  A bank representative worked in the plaintiff's

12  home organizing all financial paperwork and had access to all of the plaintiff's financial

13  information; the bank representative's job was to gather information about the plaintiff and to make

14  sure that all of their substantial assets remained under the management of the bank.  <u>Id.</u>  The bank

15  representative introduced the plaintiff to an estate attorney and a certified public accountant.  <u>Id.</u>

16  The bank representative did not agree with the plaintiff's investment decisions, so she started

17  advising the plaintiff to change strategies.  <u>Id.</u>  The plaintiff signed a document with an arbitration

18  provision even though the plaintiff thought he was only signing documents to open accounts with

19  the bank.  <u>Id.</u> at 948-49.  The plaintiff could not see the fine print of the agreement.  <u>Id.</u> at 949.  No

20  one explained the purpose of the documents to be signed, even though the bank's representative

21  knew that the plaintiff could not read the document.  <u>Id.</u>

22          <u>Brown</u> instead supports Plaintiff's position.  <u>See</u> <u>Brown</u>, 168 Cal.App.4th at 959 ("Generally,

23  it is *not reasonable* to fail to read a contract; this is true even if the plaintiff relied on the defendant's

24  assertion that it was not necessary to read the contract.  Reasonable diligence requires a party to read

25  a contract before signing it.") (internal citations omitted) (emphasis in original).  Defendant testified

26  that she was competent when she signed the guaranties.  Unlike <u>Brown</u>, here there is no fiduciary

27  relationship between Plaintiff and Defendant.  While Defendant argues that a reasonable jury could

28  find that Plaintiff should have "done more" to ensure that Defendant knew what she was signing, the

17

United States District Court
For the Northern District of California

1   unusual circumstances present in <u>Brown</u> are absent here.  In addition, the notary public informed

2   Defendant of the titles of the documents.  Appx Ex. 27 at 41 (Engler testified that prior to Defendant

3   signing documents, Engler would physically hand the document to Defendant, read aloud the title of

4   the document and show Defendant where to sign).  Although Defendant points out that Engler was

5   not familiar with a commercial guaranty, there is no evidence that she therefore did not tell

6   Defendant what she was signing.  Def.'s Ex. 26 at 48-49.  Although Defendant is an elder (and was

7   so during the time of the majority of the loans at issue in this case), there is no evidence that she was

8   as infirm as the <u>Brown</u> plaintiff or that she had physical disabilities that prevented her from seeing or

9   reading the documents.

10        Defendant also argues that <u>Bruni v. Didion</u>, 160 Cal.App.4th 1272 (2008) shows that the rule

11  that one who signs a document may not avoid the impact of its terms on the ground that he failed to

12  read it only applies in the absence of overreaching or imposition.  <u>Bruni</u>, however, is not on point

13  because it did not involve a signed contract but instead a unilateral arbitration provision buried in a

14  thirty-page warranty booklet in ten point type which the plaintiff had not signed.  <u>Id.</u> at 1279, 1287,

15  1293.  Here, the guaranties are short documents that are expressly contracts, Defendant signed them

16  and Plaintiff would not have made the loans without the guaranties.  <u>Wright v. Lowe</u>, 140

17  Cal.App.2d 891 (1956) is also inapposite.  There, the court held that a "deposit receipt" for the

18  purchase and sale of real property could be rescinded based on mutual mistake because both parties

19  were mistaken as to the terms of the document.  Here, mutual mistake is not at issue.  Further, in

20  <u>Wright</u>, the defendant's agent misled the seller with a "faulty explanation," whereas here, there is no

21  allegation that anyone at Plaintiff's bank misled Defendant with any explanation and the terms of the

22  guaranty were stated in the document.

23        Next, Defendant argues that cases involving contracts with ambiguous "dragnet" clauses

24  require courts to particularly examine mutual consent.  See <u>Gates v. Crocker-Anglo Nat. Bank</u>, 257

25  Cal.App.2d 857, 859-61 (1968) ("The court, in so holding, first noted that 'dragnet' clauses were not

26  highly regarded in equity, were subject to careful scrutiny and strict construction and could be

27  overturned on a showing of concealment, haste or artifice."); <u>Fisher v. First Int't Bank</u>, 109

28  Cal.App.4th 1433, 1446-47 (2003) ("Because a dragnet clause is one of the provisions 'least likely'

18

1   to be understood by a layperson reading the fine print of a deed of trust, California limits the

2   enforcement of such a provision 'to those transactions where objective evidence discloses the

3   intention of the debtor and the creditor to enlarge the lien to include other obligations.' The

4   proponent of a dragnet clause bears the burden of establishing that the parties intended all existing or

5   contemporaneous loans to be included within its scope.") (internal citations omitted).  In particular,

6   Defendant argues that the Hearn guaranty, which was for $2,500,000, ten times the value of the

7   related loan, somehow contained a dragnet clause solely based on the amount of the guaranty.

8   Defendant's argument is not well-taken.  Here, the guaranties did not contain dragnet clauses, which

9   "provide that the deed of trust secures the particular debt indicated and also all other obligations of

10  the trustor, whether preexisting or subsequent to the deed of trust."  12 Miller & Starr, Cal. Real

11  Estate (3d ed. 2001) § 10:12; see also Fisher, 109 Cal.App.4th at 1444.  Plaintiff is seeking

12  enforcement of the guaranties for the specific loans at issue, not some other obligation.  Thus,

13  Defendant's dragnet argument is not persuasive.

14        Finally, Defendant argues that she relied on David Poulson's misrepresentations that the

15  documents were simply deeds of trust or related loan documents for Sutter.  She states that she

16  "mistakenly relied on David Poulson's misrepresentations that documents I was signing at title

17  companies for Sonoma National Bank were "deeds of trust" or related documents for Sutter," and

18  that she "did not know my personal guaranty was required or included in those documents."  Id. ¶ 7.

19  Defendant also states that David intimidated her, and "displayed tantrums including kicking boxes,

20  slamming doors, pounding my automobile, locking me out of my office, shoving documents in my

21  face and demanding I sign them, belittling me about my understanding of loans and related

22  documents, and threatening me not to go to or talk with anyone at Sonoma National Bank."  Supp.

23  Poulson Decl. ¶ 6.  Defendant also argues that Plaintiff failed to obtain a commitment letter from

24  Defendant for the guaranties, and that the notary public was pressed for time.  These facts, however,

25  do not raise a triable issue of fact as to Defendant's consent to the guaranties.  Even assuming that

26  Defendant had a fiduciary relationship with David Poulson, she has not cited any authority that

27  would allow her to impute that relationship to Plaintiff or rely on it to escape her obligations for her

28  own actions in signing the guaranties.  Cf. Everest Investors 8 v. Whitehall Real Estate, 100

United States District Court
For the Northern District of California

1   Cal.App.4th 1102, 1104 (2002) ("If the nonfiduciary is neither an employee nor agent of the

2   fiduciary, it is not liable to the plaintiff on a conspiracy theory because a nonfiduciary is legally

3   incapable of committing the tort underlying the claim of conspiracy (breach of fiduciary duty).").

4   As described above, Defendant's failure to read the documents she was signing does not obviate her

5   consent.  Cf. Alfaro v. Community Housing Imp. Sys. & Planning Ass'n, 171 Cal.App.4th 1356,

6   1394 (2009) ("A person in a fiduciary relationship may relax, but not fall asleep. '[I]f she became

7   aware of facts which would make a reasonably prudent person suspicious, she had a duty to

8   investigate further, and she was charged with knowledge of matters which would have been revealed

9   by such an investigation.'") (internal citation omitted).  Even drawing all inferences in favor of

10  Defendant, there is no triable issue of fact as to consent.

11              **iii.    Lawful object**

12          The objects of the guaranties were lawful; a guaranty is a promise to answer for the debt of

13  another.  Cal. Civ. Code § 2787.  Defendant argues that public policy renders the contract void

14  because it was procured through elder abuse.  Defendant argues generally that a contract made in

15  violation of a statute is void and cannot be enforced.  See Cal. Civ. Code §§ 1550, 1599; see also,

16  e.g., Castillo v. Barrera, 146 Cal.App.4th 1317 (2007) (oral contract to manage a boxer could not be

17  enforced by unlicensed manager in violation of state regulatory law requiring managers to be

18  licensed).  But Defendant has not cited any case in which an entire contract was rescinded or held to

19  be void by a claim made under the elder abuse statute, and as set forth below, Defendant's

20  counterclaim for elder abuse fails.  See Opp. at 24-25.  In Bickel, the court severed an attorney's

21  fees provision in an agreement between a resident of a senior living facility and the senior living

22  there.  See Bickel v. Sunrise Assisted Living, 206 Cal.App.4th 1, 8-13 (2012) ("'[T]he arbitration

23  provision does provide for what is in effect a waiver of plaintiff's right to recover, under certain

24  circumstances, attorneys' fees under the Elder Abuse Act. To that extent, it is contrary to public

25  policy and unlawful. [Citation.] This does not require a finding that the arbitration agreement as a

26  whole is unlawful as it is not 'permeated with unconscionability.'").  Bickel did not invalidate the

27  entire contract, but only severed the fees provision.  Further, Bickel is inapplicable here because the

28  guaranties do not contain any provisions that are contrary to relief contained in the elder abuse

20

**United States District Court**
For the Northern District of California

1   statute.  Defendant has not raised a triable issue of fact as to whether the guaranties had a lawful

2   purpose.

### iv.   Sufficient consideration

4   Fourth, Plaintiff argues that consideration exists because the loans were fully funded.

5   Defendant does not dispute there was sufficient consideration for the guaranties.

### v.   Conclusion

7   Thus, there is no triable issue of fact that there was a valid contract.

## B.   Default of borrower and Defendant's failure to perform

9   There is no dispute that Sutter failed to make timely loan payments, thereby triggering

10  Defendant's obligation to pay.  Brixey Decl. ¶¶ 6-7, 13-14, 20-21, 27-28.  Pursuant to the guaranties,

11  Defendant was obligated to pay Plaintiff under the loans.  Shin Decl. ¶¶ 5, 10, 15, 20; Brixey Decl.

12  ¶¶ 4, 11, 18, 25.  It is undisputed that Defendant had not performed under guaranties.

## C.   Damages

14  Defendant argues that Plaintiff cannot establish damages for the Normandie and Moorland

15  loans, so Plaintiff cannot prevail on its breach of guaranty claims for those loans.

16  As to the Normandie loan, it is undisputed that Plaintiff received $216,000 from a junior

17  lienholder for a release of Plaintiff's deed of trust on the property.  The testimony and exhibits show

18  that the total payoff amount due for the Normandie property was $224,872.57.  deVries Decl. Ex. 8

19  at 90 (Brixey Depo); Ex. 12.  Therefore, as Brixey stated in his declaration, there was a balance due

20  of $8,872.57 on the Normandie loan after the $216,000 payment by another lienholder.  Brixey Decl.

21  ¶ 27.  As to the Moorland loan, Defendant argues that Plaintiff received the entire payoff demand,

22  although Plaintiff's evidence shows that there was an outstanding balance of $650.48.  Brixey Decl.

23  ¶ 21.

24  Defendant's expert Sarsfield opined that the amounts paid on the Normandie and Moorland

25  loans covered Plaintiff's principal balance and the out-of-pocket expenses, so there is no balance left

26  on the loan and no damages.  Sarsfield Decl. Ex. 1 at 1-6.   However, as discussed more fully above,

27  the Sarsfield opiniond as to the amounts paid and remaining on the loans at issue are stricken as

28  conclusory and not of assistance to the Court in determining the remaining balances on the loan

accounts because the opinion simply recites the contents of various documents in this case without any support for or explanation of his calculations or how he reached his conclusions.

Defendant argues that it is contrary to public policy to allow Plaintiff to recover fees against Defendant because attorney's fees provisions protecting elder abuse victims are intentionally one-sided.  See, e.g., Bates v. Presbyterian Intercommunity Hospital, Inc., 204 Cal.App.4th 210, 217 (2012) ("The Elder Protection Act contains attorney fee provisions that permit an award of attorney fees to successful plaintiffs. Specifically, Welfare and Institutions Code sections 15657 and 15657.5 provide that where it is proven by a preponderance of the evidence that the defendant is liable for 'physical abuse,' 'neglect,' or 'financial abuse' as defined elsewhere in the statute, '[t]he court shall award to the plaintiff reasonable attorney's fees and costs.'").  Plaintiff, however, is not seeking fees under the elder abuse statute, as was the question in Bates, but instead seeks fees pursuant to the guaranties.  The Bates court held that the attorney fee shifting statute in the elder abuse act did not apply to settlement offers made under California Code of Civil Procedure section 998, and awarded the defendant its costs against the plaintiff.  Further, in Thompson v. Miller, 112 Cal.App.4th 327, 338 (2003), the court held that a contract allowed the defendants there to recover fees incurred in defeating the plaintiff's claims, including their claims under the elder abuse act.

Defendant also argues that because the damages for these two loans alone do not meet the jurisdictional minimum for the amount in controversy for purposes of diversity jurisdiction, the Court lacks subject matter jurisdiction.  However, Plaintiff also seeks to recover on other loans with balances due well in excess of $75,000.  It is well-settled that in an action by a single plaintiff against a single defendant, all claims are aggregated to assess whether the jurisdictional threshold is satisfied.  See Bank of Cal. Nat'l Ass'n v. Twin Harbors Lumber Co., 465 F.2d 489, 491 (9th Cir. 1972).

**D.**   **Conclusion**

Therefore, there are no triable issues of fact as to Plaintiff's claims for breach of the guaranties.  Plaintiff's Motion for Summary Judgment is granted.

**2.**   **There is no triable issue of fact that Defendant's claims under the Elder Abuse Act, California Welfare and Institutions Code section 15610.30 are barred by the statute of limitations**.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

The parties agree that the California Welfare and Institutions Code section 15610.30 as it existed prior to amendment in 2009 applies to this case:

(a) 'Financial abuse' of an elder or dependent adult occurs when a person or entity does any of the following:

(1) Takes, secretes, appropriates, or retains real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

(2) Assists in taking, secreting, appropriating, or retaining real or personal property of an elder or dependent adult to a wrongful use or with intent to defraud, or both.

(b) A person or entity shall be deemed to have taken, secreted, appropriated, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates or retains possession of property in bad faith.

(1) A person or entity shall be deemed to have acted in bad faith if the person or entity knew or should have known that the elder or dependent adult had the right to have the property transferred or made readily available to the elder or dependent adult or to his or her representative.

(2) For purposes of this section, a person or entity should have known of a right specified in paragraph (1) if, on the basis of the information received by the person or entity or the person or entity's authorized third party, or both, it is obvious to a reasonable person that the elder or dependent adult has a right specified in paragraph (1).

(c) For purposes of this section, 'representative' means a person or entity that is either of the following:

(1) A conservator, trustee, or other representative of the estate of an elder or dependent adult.

(2) An attorney-in-fact of an elder or dependent adult who acts within the authority of the power of attorney."

deVries Decl. Ex. 22.  The parties also agree that the statute of limitations is four years.  Cal. Wel. & Inst. Code § 15657.7 ("An action for damages pursuant to Sections 15657.5 and 15657.6 for financial abuse of an elder or dependent adult, as defined in Section 15610.30, shall be commenced within four years after the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered, the facts constituting the financial abuse.").

Defendant executed the last of the four guaranties at issue in this case on February 9, 2007, so the statute ran on February 8, 2011.  Defendant did not file her counterclaims until May 2013. Therefore, her claims are time-barred unless tolled.

Defendant argues that her confidential relationship with David Poulson tolled the statute of

1    limitations until mid-2011 because Plaintiff was aware of Defendant's confidential relationship with

2    her son, and Plaintiff's misconduct arose out of that knowledge.  Defendant points to deposition

3    testimony of bank employees who had conversations with Defendant in which she told the

4    employees to contact David about any defaults in the loans to Sutter.  See, e.g., deVries Decl. Ex. 7

5    at 64-65; Ex. 8 at 18-19; see Herbert v. Lankershim, 9 Cal.2d 409, 483 (1937) (citing jury

6    instruction: "'The law defines a confidential relation as any relation existing between parties to a

7    transaction wherein one of the parties is in duty bound to act with the utmost good faith for the

8    benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one

9    person in the integrity of another, and in such a relation the party in whom the confidence is reposed,

10   if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts

11   relating to the interest of the other party without the latter's knowledge or consent. A fiduciary

12   relation in law is ordinarily synonymous with a confidential relation. It is also founded upon the

13   trust or confidence reposed by one person in the integrity and fidelity of another, and likewise

14   precludes the idea of profit or advantage resulting from the dealings of the parties and the person in

15   whom the confidence is reposed.'").  Herbert, however, does not address tolling.  Further, none of

16   the other cases that Defendant relies on for her argument that a confidential relationship tolls the

17   statute of limitations address the tolling of the statute of limitations.  See, e.g., Richelle L. v. Roman

18   Catholic Archbishop, 106 Cal.App.4th 257, 271, n.4 (2003) (no discussion of tolling); Kent v. First

19   Trust & Savings Bank of Pasadena, 101 Cal.App.2d 361, 370 (1950) (no discussion of tolling);

20   Adams v. Talbott, 61 Cal.App.2d 315, 320 (1943) (no discussion of tolling).

21          Defendant's focus on the confidential relationship between Defendant and David Poulson is

22   misplaced.  Defendant has not cited any case tolling a claim against a defendant based on the

23   defendant's confidential relationship with a third party.  At the hearing, Defendant cited Hobart v.

24   Hobart Estate, 26 Cal.2d 412, 442 (1945) for the argument that tolling of the statute of limitations is

25   permitted during the period of a fiduciary relationship.  See Hobart, 26 Cal.2d at 442 ("Although the

26   general rules relating to pleading and proof of facts excusing a late discovery of fraud remain

27   applicable, it is recognized that in cases involving such a relationship facts which would ordinarily

28   require investigation may not excite suspicion, and that the same degree of diligence is not required.

24

In <u>Rutherford v. Rideout Bank</u>, 11 Cal.2d 479, 486 [80 P.2d 978, 117 A.L.R. 383], it was said that because of such a relationship plaintiff could not be charged with lack of diligence even though an inquiry would have disclosed the true value of the property involved.").  Defendant, however, fails to sufficiently connect any fiduciary relationship that she may have had with her son to Plaintiff.

 Defendant argues that it was only after she was sued by Plaintiff in state court in September 2011 to pursue the Elmira guaranty that she discovered that she had executed any personal guaranty. Poulson Decl. ¶ 7; <u>Jolley v. Eli Lilly & Co.</u>, 44 Cal.3d 1103, 1109 (1988) ("The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause.").  Defendant makes a curious argument that she "did not and could not have known that she would be exposed to any damages or would incur elder abuse damages as against [Plaintiff] SNB until the plaintiff used her to enforce these guaranties."  Opp. at 15.  Therefore, according to Defendant, she had no damages until she was in default in 2010 and beyond.  <u>Id.</u>  But Plaintiff's exposure to enforcement of the guaranties was readily apparent from their text.

 Defendant has not raised a triable issue of fact as to the elements of equitable tolling, and has not rebutted the presumption that she knew or could have known the facts giving rise to her claim before the limitations period expired.  "'In order to rely on the discovery rule for delayed accrual of a cause of action, [a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery and (2) the inability to have made earlier discovery despite reasonable diligence.'"  <u>Fox v. Ethicon Endo-Surgery, Inc.</u>, 35 Cal.4th 797, 808 (2005).  The doctrine "focuses primarily on the plaintiff's excusable ignorance of the limitations period.  [It] is not available to avoid the consequences of one's own negligence."  <u>Lehman v. U.S.</u>, 154 F.3d 1010, 1016 (9th Cir. 1988).

 Even though Defendant states in her declaration in support of her motion for summary judgment and the reply that she did not know that she signed personal guaranties until she was sued in 2011 (Poulson Decl. ¶ 7; Supp. Poulson Decl. ¶ 7), she acknowledged in her deposition that the signatures on the guaranties were hers and that she was competent at the time she signed.  Defendant argues that Engler, the notary public, was too busy to completely fill out her notary forms, but it is

1    undisputed that the notary public told Defendant the name of each document as the notary public

2    gave them to Defendant to sign.  There is no evidence that Plaintiff concealed material facts from

3    Defendant.  See Salondaka v. Countrywide Home Loans, Inc., 2010 WL 539261, at *3 (E.D. Cal.

4    2010) (dismissing a claim that loan terms were misrepresented: "Everything that he claims was

5    fraudulently misrepresented or concealed was right there in his loan application and loan documents.

6    A person who knows the true facts cannot be said to have reasonably relied on a misstatement of

7    those facts.").  Each document was  clearly labeled as a Commercial Guaranty, so Defendant was on

8    notice as to what she was signing.

9        Moreover, there is no triable issue of fact that her admitted failure to read the documents was

10   not reasonably diligent.  Her failure to read the guaranties was negligent, not reasonable.  See Rey v.

11   OneWest Bank, 2013 WL 127839, at *5 (E.D. Cal. Jan. 9, 2013) ("The Loan terms, which Plaintiff

12   claims had not been disclosed to him by the lender, appear clearly on the face of the pages of the

13   Loan documents that Plaintiff signed or initialed.  A reasonably diligent person would have read the

14   loan's material terms upon signing, or, at a minimum, after receiving the loan documents. Thus, it

15   was not reasonable for Plaintiff to wait until the Notice of Trustee's Sale before first examining the

16   loan papers and material loan terms.") (internal citations omitted).  Accordingly, Defendant's elder

17   abuse counterclaims are time-barred.

18   **3.    There is no triable issue of fact as to the absence of wrongful or bad faith conduct by
         Plaintiff under the elder abuse act, California Welfare and Institutions Code section**
19       **15610.30.**

20       Defendant argues that Plaintiff violated California Welfare and Institutions Code section

21   15610.30 in two ways: (1) by directly taking Defendant's property by virtue of accepting the

22   guaranties (Cal. Welf. & Inst. Code § 15610.30(a)(1)); and (2) by assisting David Poulson in taking

23   Defendant's property by doing so (Cal. Welf. & Inst. Code § 15610.30(a)(2)).  Section 15610.30

24   stated in relevant part:

25       (a) 'Financial abuse' of an elder or dependent adult occurs when a person or entity
         does any of the following:
26
         (1) Takes, secretes, appropriates, or retains real or personal property of an elder or
27       dependent adult to a wrongful use or with intent to defraud, or both.

28       (2) Assists in taking, secreting, appropriating, or retaining real or personal property of
         an elder or dependent adult to a wrongful use or with intent to defraud, or both.

United States District Court
For the Northern District of California

1

2  Cal. Welf. & Inst. Code § 15610.30 (2008).  Both of Defendant's financial abuse theories are based

3  on Plaintiff's alleged wrongful, or bad faith, use.  Defendant argues that Plaintiff breached its duty to

4  contact or meet with Defendant to ensure that she understood the guaranties or that the guaranties

5  were fraudulently concealed by her son.

6         As Defendant acknowledges, "no court has interpreted the Legislature's definition of bad-

7  faith financial abuse to impose a duty of inquiry."  Def.'s Opp. at 2.  Nevertheless, Defendant argues

8  that because David Poulson was Defendant's established contact for Plaintiff, and because Carinalli

9  was on the loan committee, and because bank employee Rosell knew that Defendant was an elder,

10  Plaintiff had a duty to contact Defendant to make sure that she knew what she was signing.  This

11  argument rests on the opinions of Defendant's two experts, Roger Bernhardt and William Sarsfield,

12  who opine that customs and practices in the banking industry require banks to inquire as to whether

13  elders understand the documents they are signing.  As described above, however, the Bernhardt and

14  Sarsfield declarations are stricken to the extent that they opine on issues relating to financial elder

15  abuse and on issues of law.  Further, the law is to the contrary.

16         The undisputed facts show that the guaranties were standard commercial transactions, and

17  that Defendant was competent when she signed the guaranties.  See Das v. Bank of America, 186

18  Cal.App.4th 727, 744 (2010) (dismissing the plaintiff's elder abuse claim because she failed to

19  establish that the bank "in issuing a loan to [plaintiff] and transferring his funds at his request,

20  obtained his property for an improper use, or acted in bad faith or with a fraudulent intent.");

21  Stebley, 202 Cal.App.4th at 527-28 (2011) (dismissing a § 15610.30 claim against a lender

22  enforcing its rights under a defaulted loan because: "Foreclosing on a home is not actionable [under

23  the elder abuse act] merely because it requires the former owner to move out. . . .  As we held in an

24  analogous case, 'It is simply not tortious for a commercial lender to lend money, take collateral, or

25  to foreclose on collateral when a debt is not paid.... [A] commercial lender is privileged to pursue its

26  own economic interests and may properly assert its contractual rights.'").  The elder abuse act does

27  not impose a duty to investigate even if an entity is a mandated reporter, much less when it is not.

28  See Cal. Wel. & Inst. Code § 15630.1(e) ("An allegation by the elder or dependent adult, or any

27

**United States District Court**
For the Northern District of California

1   other person, that financial abuse has occurred is not sufficient to trigger the reporting requirement

2   under this section if both of the following conditions are met: (1) The mandated reporter of

3   suspected financial abuse of an elder or dependent adult is aware of no other corroborating or

4   independent evidence of the alleged financial abuse of an elder or dependent adult. The mandated

5   reporter of suspected financial abuse of an elder or dependent adult is not required to investigate any

6   accusations. (2) In the exercise of his or her professional judgment, the mandated reporter of

7   suspected financial abuse of an elder or dependent adult reasonably believes that financial abuse of

8   an elder or dependent adult did not occur.").

9          Whether a party knowingly entered into a contract is determined by objective manifestations

10  of intent.  See Stewart v. Preston Pipeline Inc., 134 Cal.App.4th 1565, 1587 (2005) ("Mutual assent

11  to contract is based upon objective and outward manifestations of the parties; a party's 'subjective

12  intent, or subjective consent, therefore is irrelevant.') (internal citation omitted).  Defendant attempts

13  to distinguish Stewart because the parties there were represented by counsel and an insurance

14  company before signing the settlement agreement at issue in that case.  Stewart, however, did not

15  base its holding on whether the parties were represented.  Here, Defendant signed the guaranties

16  when she was competent, which objectively showed her intent.  See Marin Storage, 89 Cal.App.4th

17  at 1049 ("Every contract requires mutual assent or consent (Civ. Code, §§ 1550, 1565), and

18  ordinarily one who signs an instrument which on its face is a contract is deemed to assent to all its

19  terms. A party cannot avoid the terms of a contract on the ground that he or she failed to read it

20  before signing.").

21         Giordano v. Wachovia Mortg., 2011 WL 1130523, at *3 (N.D. Cal. Mar. 25, 2011) rejected

22  an elder abuse act claim predicated upon a bank's purported "duty to provide an oral explanation of

23  the loan terms."  The plaintiff there entered into a loan agreement for a thirty-year adjustable rate

24  mortgage with an initial interest rate of 6.710%.  Id. at *2.  After the plaintiff defaulted, and the

25  lender attempted to foreclose, the plaintiff sued the lender alleging a claim under section 15610.30

26  that the plaintiff did not understand that the interest rate was subject to change and that the lender

27  made misrepresentations about key facts in order to induce the plaintiff to enter into the loan.  Id.

28  The court held that even if the allegations were true, there was no duty by the lender to explain the

terms expressly stated in the loan:

> The Giordanos do not deny—nor can they—that they signed loan documents disclosing that "[t]he interest rate I will pay may change on the 15th day of February, 2006 and on the same day every month thereafter"; and that "[f]rom time to time, my monthly payments may be insufficient to pay the total amount of monthly interest that is due. If this occurs, the amount of interest that is not paid each month, called 'Deferred Interest,' will be added to my Principal and will accrue interest at the same rate as the Principal." Note, ¶¶ 2(B), 3(E) (bold type in original). They seem to be asserting that WSB was their agent and as such had a duty to explain the loan terms to them orally. However, "[t]he relationship between a lending institution and its borrower-client is not fiduciary in nature." Nymark v. Heart Fed. S & L Assn., 231 Cal.App.3d 1089, 1093 n. 1, 283 Cal.Rptr. 53 (1991). "A commercial lender is entitled to pursue its own economic interests in a loan transaction." Id. "This right is inconsistent with the obligations of a fiduciary which require that the fiduciary knowingly agree to subordinate its interests to act on behalf of and for the benefit of another." Id. Accordingly, the Giordanos have not alleged a basis for asserting that WSB had a duty to provide an oral explanation of the loan terms.

Id. at *3; see also Nymark v. Heart Fed. S & L Ass'n, 231 Cal.App.3d 1089, 1093, n.1 (1991) ("A commercial lender is entitled to pursue its own economic interests in a loan transaction.").

Defendant argues that Giordano is distinguishable because it applied the current elder abuse act as amended in 2008 to eliminate the requirement of bad faith, not its predecessor applicable here. Defendant also attempts to distinguish Giordano on the ground that the court there considered whether the financial institution's fraud constituted elder abuse, but Defendant is not seeking relief under the fraud provision of the elder abuse act. Defendant also notes that in Giordano, the plaintiff took issue with one provision of the contract, while here, Defendant takes issue with the entire document. These distinctions, however, are not material. Moreover, the 2008 amendments to section 15610.30 made it easier for a plaintiff to state a claim under the elder abuse act.

Defendant also argues that the elder abuse statute itself imposes a duty to inquire by virtue of the use of the language "should have known" in § 15610.30(b):

> A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity takes, secretes, appropriates, obtains, or retains the property and the person or entity knew or *should have known* that this conduct is likely to be harmful to the elder or dependent adult.

(Emphasis added). However, the statute does not impose a duty to investigate whether the conduct would be harmful in the absence of such reason to know. Defendant has not raised a triable issue of fact that Plaintiff should have known of likely harm to Defendant.

United States District Court
For the Northern District of California

1    Defendant notes that the USA Patriot Act and the Bank Secrecy Act contain a Know-Your-

2    Customer program to ensure immediate detection and identification of suspicious activities at

3    financial institutions.  Defendant argues that Plaintiff did not have a Know-Your-Customer policy

4    and even if it did, it did not follow it in this case.  Def.'s Ex. 53 at 48-50.  However, the USA Patriot

5    Act and other federal acts cited by Defendant do not provide a private right of action.  See In re

6    Agape, 681 F. Supp. 2d 352, 360-61 (E.D. N.Y. 2010) (". . . because the Bank Secrecy Act does not

7    create a private right of action, the Court can perceive no sound reason to recognize a duty of care

8    that is predicated upon the statute's monitoring requirements."); Sanders v. Michigan First Credit

9    Union Tellers, 2010 WL 3168636, at *2 (E.D. Mich. Aug. 10, 2010) ("But even if the Patriot Act

10   and implementing regulations did require banks to review photo identification before allowing

11   withdrawals, Sanders's claim would still fail because, as various courts have routinely held, the

12   Patriot Act does not provide for a private right of action for its enforcement.").  Moreover, the

13   Know-Your-Customer program does not apply to individuals, such as Defendant, who became bank

14   customers before June 8, 2003.  31 C.F.R. § 1020.100(c)(2)(iii) (stating that a customer as defined in

15   the act does not include: " A person that has an existing account with the bank, provided that the

16   bank has a reasonable belief that it knows the true identity of the person.").  Further, the Know-

17   Your-Customer program applies to individuals who open new accounts, not existing customers like

18   Defendant.  31 C.F.R. § 1020.100 (defining customers as: "(i) A person that opens a new account;

19   and (ii) An individual who opens a new account for: (A) An individual who lacks legal capacity,

20   such as a minor; or (B) An entity that is not a legal person, such as a civic club.").  There is no

21   dispute that Plaintiff knew the identity of the person signing the guaranties.

22   Moreover, these federal statutes do not impose any duty on banks to explain the terms of the

23   guaranties to Defendant.  Finally, the purpose of the Know-Your-Customer program, as

24   acknowledged by Defendant at the hearing, is not to protect bank customers, but to the contrary, to

25   protect the banks and the government from money-laundering and other criminal activity by their

26   customers.  See, e.g., In re Angulo, 2010 WL 3187638, at *2 (D. Or. Aug. 11, 2010) ("The purpose

27   of the USA Patriot Act and its attendant regulations is to protect the nation from money laundering

28   and terrorist activities.").

30

Defendant attempts to rely on the test in <u>Stevenson v. Superior Court</u>, 16 Cal.4th 880, 888-90 (1997) for a tortious employment discharge claim in violation of public policy:

> First, the policy must be supported by either constitutional or statutory provisions. Second, the policy must be "public" in the sense that it "inures to the benefit of the public" rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the discharge. Fourth, the policy must be "fundamental" and "substantial."

<u>Id.</u> at 889-90.  <u>Stevenson</u> did not involve the elder abuse act or any similar facts, and was limited to determining whether a policy can support a tortious employment discharge claim, not an elder abuse statutory claim.  Moreover, in <u>Stevenson</u>, the court noted that the broad policy against age discrimination in employment was embodied in the Fair Employment and Housing Act ("FEHA"), as well as numerous other statutes.  <u>See id.</u> at 896-97 (". . . over 30 California code sections that prohibit age discrimination or implement a policy against age discrimination in specific areas such as education, health care, land use regulation, and state employment. (See, e.g., Civ. Code, § 51.2 [housing]; Gov. Code, § 11135 [state funded programs]; id., § 65008 [land use regulation]; Health & Saf. Code §§ 1317, 1317.3, 1365.5 [health *897 care]; Ed. Code, §§ 260, 262, 262.1, 262.2, 66030, 69535 [education]; Gov. Code, §§ 18932, 19700, 19706, 19793 [civil service]; Lab. Code, § 1777.6 [public works contracts]; Unemp. Ins. Code, § 16000 et seq. [employment training for older workers].) These laws provide further evidence that the Legislature regards the policy against age discrimination as important and that this policy is now firmly rooted in California law.").  Here, Defendant's argument that a competent senior citizen should have been treated differently than younger customers engaging in loan transactions arguably runs counter to public policy that competent older adults are just as capable of managing their financial affairs as younger persons, absent notice of the contrary.

Defendant also argues that state law imposes a duty of inquiry on Plaintiff in this case based on <u>Jolley v. Chase Home Finance</u>, 213 Cal.App.4th 872 (2013).  In <u>Jolley</u>, the court addressed whether a bank had a duty to a borrower under a construction loan.  On the issue of duty, the court stated:

> Even when the lender is acting as a conventional lender, the no-duty rule is only a general rule. (<u>Osei v. Countrywide Home Loans</u> (E.D.Cal.2010) 692 F.Supp.2d 1240, 1249.) As a recent federal case put it: " <u>Nymark</u> does not support the sweeping

31

conclusion that a lender never owes a duty of care to a borrower. Rather, the Nymark court explained that the question of whether a lender owes such a duty requires 'the balancing of the " Biakanja factors." ' " ( Newson v. Countrywide Home Loans, Inc. (N.D.Cal. Nov. 30, 2010 No. C 09–5288) 2010 WL 4939795, at p. *5, 2010 U.S. Dist. Lexis 126383, at p. *15.) Or, in the words of an even more recent case, in each case where the general rule was applied to shield a lender from liability, "the plaintiff sought to impose upon the lender liability for activities outside the scope of the lender's conventional role in a loan transaction. It is against this attempt to expand lender liability (to that of, e.g., an investment advisor or construction manager) that the court in Nymark found a financial institution owes no duty of care to a borrower when its involvement in the loan transaction 'does not exceed the scope of its conventional role as a mere lender of money.' Nymark, 231 Cal.App.3d at 1096, 283 Cal.Rptr. 53. Nymark and the cases cited therein do not purport to state a legal principle that a lender can never be held liable for negligence in its handling of a loan transaction within its conventional role as a lender of money." ( Ottolini v. Bank of America (N.D.Cal. Aug. 19, 2011 No. C–11–0477) 2011 WL 3652501, at p. *6, 2011 U.S. Dist. Lexis 92900, at p. *16.) We agree with these observations.

Chase relies upon the historical truism that a bank as lender is entitled to pursue its own economic interest in dealing with a borrower, citing Kruse v. Bank of America (1988) 202 Cal.App.3d 38, 67, 248 Cal.Rptr. 217. We live, however, in a world dramatically rocked in the past few years by lending practices perhaps too much colored by short-sighted self-interest. We have experienced not only an alarming surge in the number of bank failures, but the collapse of the housing market, an avalanche of foreclosures, and related costs borne by all of society. There is, to be sure, blame enough to go around. And banks are hardly to be excluded.

Jolley, 213 Cal.App.4th at 901-02.

Jolley is inapposite.  The issue in that case was whether a construction lender was negligent in performing its contractual duties to the borrower.  There, the plaintiff obtained a construction loan and the lender was obligated to disburse the funds as construction progressed, but the lender breached its obligation to disburse funds when the lender lost the loan documents, resulting in an eight month delay of construction.  Jolley, 213 Cal.App.4th at 878.  Under those facts, the court held that there was a triable issue of fact as to whether the lender was negligent.  The court emphasized that the issue of negligence arose in the context of a construction loan:

We note that we deal with a construction loan, not a residential home loan where, save for possible loan servicing issues, the relationship ends when the loan is funded. By contrast, in a construction loan the relationship between lender and borrower is ongoing, in the sense that the parties are working together over a period of time, with disbursements made throughout the construction period, depending upon the state of progress towards completion. We see no reason why a negligent failure to fund a construction loan, or negligent delays in doing so, would not be subject to the same standard of care.

Jolley, 213 Cal.App.4th at 901.

1        Here, by contrast, Defendant has not alleged negligence by Plaintiff in connection with

2  construction loans involving ongoing distributions of the proceeds over time, but is instead

3  attempting to impose a novel duty on Plaintiff.  See Makreas v. First National Bank of No. Cal.,

4  2013 WL 2436589, at *14 (N.D. Cal. June 4, 2013) ("Makreas argues in response to Defendants'

5  motion that 'a construction lender owes duties to defaulting borrowers over and beyond what a

6  traditional lender does, particularly when things have gone awry.'  Opp'n at 22.  Makreas cites Jolley

7  v. Chase Home Fin., LLC, 213 Cal.App.4th 872, 153 Cal.Rptr.3d 546 (Cal.Ct.App.2013) in support

8  of this argument. Jolley, however, is inapposite, as it holds that a lender owes a borrower a duty of

9  care in connection with disputes arising out of the performance of a construction loan agreement. Id.

10  at 901, 153 Cal.Rptr.3d 546. Fiduciary duties are not at issue in Jolley.").

11        In her reply, Defendant also argues that Plaintiff had a duty to inquire based on "suspicious

12  circumstances," citing Sun'n Sand, Inc. v. United California Bank, 21 Cal.3d 671 (1978).  There, the

13  court noted that banks cannot ignore danger signals such as checks with large amounts drawn

14  payable to the order of a bank presented by a third party to negotiate for the personal benefit of a

15  bank employee, noting: "*The duty is narrowly circumscribed:* it is activated only when checks, not

16  insignificant in amount, are drawn payable to the order of a bank and are presented to the payee

17  bank by a third party seeking to negotiate the checks for his own benefit. *Moreover, the bank's*

18  *obligation is minimal.* We hold simply that the bank may not ignore the danger signals inherent in

19  such an attempted negotiation. There must be objective indicia from which the bank could

20  reasonably conclude that the party presenting the check is authorized to transact in the manner

21  proposed. In the absence of such indicia the bank pays at its peril."  Sun'n Sand, 21 Cal.3d at 695-96

22  (emphasis added); see also Joffe v. United California Bank, 141 Cal.App.3d 541, 556 (1983) ("We

23  agree with the Joffes that the circumstances alleged in their complaint are sufficiently suspicious to

24  come within a rule similar to that imposed in Sun 'N Sand. B of A accepted Continental's

25  indorsement on a $25,000 check payable to an 'escrow trust' at Wells Fargo Bank. While

26  Continental's name appeared on the payee line, Continental was not the designated payee and was

27  not identified as the authorized representative of the payee.").  Here, however, Plaintiff has not come

28  forward with evidence of such objective warning signs with respect to the four loans at issue.

Although Defendant states in her declaration that David Poulson wrote her name on checks with respect to different transactions (Poulson Supp. Decl. ¶ 4; Ex. 3), there is no evidence that any of Defendant's signatures relating to the loans at issue in this case were forged or that Plaintiff had any other reason to believe that there were suspicious circumstances surrounding the execution of the guaranties at issue.

Thus, even if Defendant's elder abuse claims were timely, there is no triable issue of material fact as to bad faith. Therefore, the Court need not reach the other aspects of the elder abuse claim. Plaintiff is entitled to summary judgment as to Defendant's counterclaims based on elder abuse.

**Conclusion**

Plaintiff's motion for summary judgment is granted because there is no triable issue of fact that Defendant breached the guaranties. Plaintiff's motion for summary judgment on the counterclaims is granted and Defendant's motion for summary judgment on the counterclaims is denied because there is no triable issue of fact as to her elder abuse claims.

**IT IS SO ORDERED.**

Dated: July 29, 2013

ELIZABETH D. LAPORTE
United States Chief Magistrate Judge

United States District Court
For the Northern District of California

34